**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **KENNETH P. ZENKA,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )    **No. 11 C 7039** |
| | ) |
| **MICHAEL J. ASTRUE, Commissioner** | )    **Judge Ruben Castillo** |
| **of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM OPINION AND ORDER

Pursuant to the Social Security Act ("the Act"), 42 U.S.C. §§ 405(g) and 1383(c),

Kenneth P. Zenka ("Plaintiff") seeks judicial review of the final decision of the Commissioner of

the Social Security Administration ("SSA") denying his application for disability benefits. (R. 1,

Compl.) Plaintiff requests that the decision of the Administrative Law Judge ("ALJ") be set

aside or, in the alternative, that the matter be reversed and remanded for further proceedings. (*Id.*

¶ 8.) Presently before the Court is Plaintiff's motion for summary judgment. (R. 14, Pl.'s Mot.)

For the reasons set forth below, the Court finds that the ALJ erred in denying Plaintiff's

application and reverses and remands this matter for proceedings consistent with this opinion.

### RELEVANT FACTS

Plaintiff was born on June 25, 1951 and is a resident of Chicago, Illinois. (A.R. 150.)[1]

Plaintiff completed four or more years of college in 1981, (A.R. 198), and he previously worked

---

[1] Citations to (R.) refer to the record number that a document is assigned on the docket for this case. Citations to (A.R.) refer to the administrative record of the SSA proceedings, which was filed as R. 10 on the docket.

as a mortgage broker, (A.R. 50). Plaintiff filed a claim for a period of disability, disability insurance benefits, and supplemental security income on February 29, 2008. (A.R. 13, 150-61.) Plaintiff's claim was denied on June 6, 2008. (A.R. 13, 91-95.) Plaintiff filed for reconsideration on June 12, 2008, but his request for reconsideration was denied on December 30, 2008. (A.R. 13, 96, 100.) Plaintiff requested an SSA hearing on February 16, 2009. (A.R. 106.) That hearing was held before an ALJ on August 16, 2010. (A.R. 13.) On December 1, 2010, the ALJ issued a decision denying Plaintiff disability and disability insurance benefits. (A.R. 10.)

## I. Medical Evidence

Plaintiff alleges disability as a result of retinal impairments in both eyes, obesity, hypertension, and a bone spur in his right heel. (A.R. 15.) Plaintiff alleges that the symptoms caused by these impairments, including reduced vision, lack of depth perception, lack of balance, difficulty reading, and pain, numbness and tingling, limit his ability to work. (A.R. 194.) Plaintiff further alleges that the onset date of his symptoms is July 1, 2007. (*Id.*)

In or around March 2007, Plaintiff experienced retinal detachment in his left eye. (A.R. 359.) Plaintiff also had small tears and holes in the retina of his right eye. (A.R. 42.) These issues were diagnosed in July 2007. (A.R. 303.) On July 8, 2007, Plaintiff underwent outpatient surgery to repair the damage to his right eye. (*Id.*) In October 2007, Plaintiff underwent outpatient scleral buckle surgery on his left eye. (A.R. 360.) This surgery failed to correct the retinal detachment. (A.R. 43.) In December 2007, Plaintiff's treating ophthalmologist, R. Ahuja, M.D. ("Dr. Ahuja"), reported that Plaintiff's corrected distance vision was 20/20 in his right eye and "count fingers" in his left eye. (A.R. 359.) Dr. Ahuja also stated that Plaintiff had cataracts

in both eyes, but he noted that these cataracts did not affect Plaintiff's vision. (A.R. 360.)
According to Dr. Ahuja, Plaintiff's visual impairment made him "[u]nable to perform work that
requires binocular vision." (A.R. 361.)

In December 2007, Plaintiff was evaluated by his treating physician, K. Pahuja., M.D.
("Dr. Pahuja"). (A.R. 251-54.) Dr. Pahuja reported that Plaintiff's blood pressure, at 110/70,
was "well under control." (A.R. 252.) Dr. Pahuja reported that Plaintiff had retinal detachment
in his left eye and that his corrected vision was 20/20 in the right eye and "CF 1 foot" in the left
eye. (*Id.*) Dr. Pahuja also observed that Plaintiff was obese. (*Id.*) Dr. Pahuja indicated that
Plaintiff had "full capacity" to work an eight-hour day, five days per week. (A.R. 254.) Dr.
Pahuja further indicated that Plaintiff could lift "no more than 50 pounds at a time with frequent
lifting of up to 25 pounds" during an eight-hour work day, five days per week. (*Id.*)

On May 30, 2008, Sanjay N. Rao, M.D. ("Dr. Rao"), conducted a consultative eye exam
at the request of the Bureau of Disability Determination Services ("DDS"). (A.R. 264.) Dr. Rao
observed that Plaintiff wore glasses and reported that Plaintiff's corrected vision was 20/40 in the
right eye and "light perception" in the left eye. (*Id.*) Dr. Rao observed retinal detachment in
Plaintiff's left eye. (*Id.*) Dr. Rao performed the Goldmann Visual Field test and obtained normal
results in Plaintiff's right eye, but he was unable to perform the test on Plaintiff's left eye because
of the eye's poor vision and fixation. (*Id.*) According to Dr. Rao, Plaintiff's "visual tasking and
ambulation" were "relatively normal" because of the vision in Plaintiff's right eye. (*Id.*)

A June 2, 2008, Physical Residual Functional Capacity Assessment by Solfia Saulog,
M.D. ("Dr. Saulog"), indicated that Plaintiff had a limited field of vision and should avoid

concentrated exposure to hazards. (A.R. 271-72.) Dr. Saulog stated that Plaintiff's complaints about his left eye were only "partially credible when compared to the objective medical evidence." (A.R. 275.) According to Dr. Saulog, Plaintiff's hypertension did not cause any functional limitations. (A.R. 275.) Dr. Saulog found no exertional limitations. (A.R. 269.)

After Plaintiff filed for reconsideration, Barry Fischer, M.D. ("Dr. Fischer"), conducted an internal medicine consultation exam on December 16, 2008, at the request of DDS. (A.R. 303.) Dr. Fischer evaluated Plaintiff for hypertension and for a detached retina in the left eye. (*Id.*) Dr. Fischer reported that Plaintiff weighed 252.3 pounds and had a blood pressure of 140/80. (A.R. 304.) According to Dr. Fischer, Plaintiff reported taking anti-hypertensive medications prescribed by the Internal Medicine Clinic at John Stroger Hospital. (A.R. 303.) At the time of Dr. Fischer's evaluation, Plaintiff was taking three medications daily: Atenolol (100 mg), amlodipine (10 mg), and hydrochlorothiazide (25 mg). (*Id.*) Dr. Fischer stated that Plaintiff's corrected vision was 20/30 in the right eye and "worse than 20/200" in the left eye. (A.R. 304.)

On February 20, 2009, Plaintiff was treated at Stroger Hospital for pain in his right heel. (A.R. 335.) X-rays revealed a "small calcaneal plantar heel spur" and "mild degenerative changes." (*Id.*) The records from that visit indicate that Plaintiff was six feet, two inches tall and weighed 240 pounds. (A.R. 332.)

In December 2009, Plaintiff was seen by Christian Okezie, M.D. ("Dr. Okezie"), who measured Plaintiff's blood pressure at 131/87 and prescribed him blood pressure medications. (A.R. 368.) Dr. Okezie observed that Plaintiff was six feet, two inches tall and weighed 262 pounds. (*Id.*)

On March 26, 2010, Dr. Ahuja conducted an assessment of Plaintiff's vision. (A.R. 316.) Dr. Ahuja reported that Plaintiff's corrected vision was 20/30 in the right eye and "20/hand movements" in the left eye. (*Id.*) Dr. Ahuja stated that Plaintiff "may have difficulty with depth perception and avoiding hazards in the work place." (*Id.*)

## II.    The ALJ Hearing

A hearing was conducted by ALJ Judith S. Goodie on August 16, 2010. (A.R. 37.) Plaintiff appeared in person and was represented by his attorney, Sean Gingrich. (*Id.*) Additional testimony was provided by a vocational expert ("VE"), Cheryl Hoiseth. (*Id.*) Also present was attorney Gerri Rivall, an observer from the Thomas Nash Law Firm. (A.R. 37, 39.)

### A.    Plaintiff's Testimony

Plaintiff testified that he had two surgeries to correct retinal detachments. (A.R. 42.) In July 2007, Plaintiff underwent laser surgery in July 2007 on his right eye that successfully returned function to Plaintiff's right retina. (A.R. 42-43.) In October 2007, Plaintiff underwent invasive surgery in his left eye; this surgery was not successful. (A.R. 43.)

The ALJ then proceeded to question Plaintiff about his work history. (A.R. 50.) Plaintiff testified that in the last 15 years, he had worked as a mortgage broker and a real estate salesperson. (A.R. 50-51.) Plaintiff further testified that he earned $2,800 in 2008 by making referrals, but he did not have any income from work in 2009 or 2010. (A.R. 52.) Plaintiff testified that he had a valid driver's license, restricted only by requiring him to wear glasses, but that he had not driven since 2007 because after he "lost [his] vision" driving was "kind of scary." (A.R. 53.) Plaintiff testified that he had tried to ride a bicycle but had accidentally ridden straight into a high curb because of his lack of depth perception. (A.R. 54.)

5

Plaintiff next testified about his ability to see depth. (A.R. 54-56.) Plaintiff stated that because of his vision problems, he could no longer see in "3D" and that the "world really flattens." (A.R. 54.) According to Plaintiff, he had trouble seeing things and telling how far away from him things were, even items sitting on a table directly in front of him. (A.R. 55.) Plaintiff further testified that he had difficulty walking because he was not sure what was in front of him, and that he had trouble going down stairs because he could not judge where the first step was. (*Id.*) Plaintiff also testified that he had lost his sense of equilibrium and that he had trouble balancing when he bent over. (A.R. 55-56.) When the ALJ inquired, Plaintiff testified that he had not received any education to help him adjust to his changed vision. (A.R. 56-57.)

The ALJ next questioned Plaintiff about his ability to take care of household chores. (A.R. 57.) Plaintiff testified that he cooked, cleaned, and shopped for himself to the best of his ability. (*Id.*) Plaintiff testified that he was able to walk the three blocks to the South Shore Line and the two blocks to the grocery store. (A.R. 56.) He testified that he had difficulty walking because of his trouble seeing and balancing. (A.R. 68-69.) He said that walking five or six blocks would be risky and tiring, calling such an endeavor "a chore." (*Id.*) Plaintiff testified that he could not see the difference between a high curb, a low curb, and a ramp on the sidewalk, and that he had trouble seeing cracks in the sidewalk. (*Id.*) Plaintiff reported that because of these concerns about walking in unfamiliar locations, he took a taxi from the train station to get to the hearing. (A.R. 68.)

The ALJ next questioned Plaintiff about how he spent his time. (A.R. 58.) Plaintiff testified that he listened to the radio, watched television, and visited with neighbors. (*Id.*)

6

Plaintiff testified that he rarely left the house because it was difficult for him to walk in unfamiliar territory. (*Id.*)

Plaintiff testified that he had a tear in his right eye that resulted in a hole or blank spot in his vision. (A.R. 59.) Plaintiff testified that this hole was "disconcerting" and painful and led to headaches and stress. (*Id.*) Plaintiff further testified that he could only see light in his left eye and that he had double vision when he tried to use both eyes at the same time. (A.R. 69.) Plaintiff testified that reading for more than a few minutes was difficult because of the amount of concentration required and because he saw floaters and holes and transposed letters and numbers. (A.R. 59, 71.) Plaintiff testified that when areas were not fully lit, he saw them as totally dark. (A.R. 70.) Plaintiff testified that his glasses were for distance, not for reading, and that although he had not discussed his reading issues with his doctor, he did not believe the problem could be corrected. (A.R. 59-61.)

The ALJ next questioned Plaintiff about his ability to stand, walk, sit, and lift. (A.R. 64-68.) Plaintiff testified that he could walk no more than five or six blocks at a time and that he could sit in a comfortable chair for more than an hour. (A.R. 64.) Plaintiff further testified that he had difficulty going up and down stairs because he could not discern where the steps were. (A.R. 64-65.) Plaintiff testified that once he got on the first step, he had an easier time with the stairs as long as he could hold on to the rail. (A.R. 65.) Plaintiff testified that he had occasional problems with his knees and back from "being out of shape," but that his back problems typically resolved on their own within a few months. (A.R. 66.) Plaintiff reported weighing 263 pounds and gaining 60 to 70 pounds since he allegedly became disabled. (A.R. 67.) However, the ALJ clarified that Plaintiff had not gained that much weight because he weighed 252 pounds in 2008.

7

(*Id.*) Plaintiff testified that he could carry a gallon of milk across a room and could perhaps lift 20 pounds. (*Id.*)

Plaintiff testified that his former boss tried to help him find a new role in the company when Plaintiff began to have trouble seeing. (A.R. 72.) Plaintiff testified that his boss allowed Plaintiff to do telemarketing where a computer automatically phoned people and showed information on the screen. (*Id.*) Plaintiff testified that he attempted to perform this job, but he experienced eye pain and headaches when he tried to read the information on the screen for more than 15 to 20 minutes. (*Id.*) Plaintiff further testified that he had to close his eyes for 20 to 30 minutes in order to make the pain go away. (A.R. 73.)

### B. Vocational Expert's Testimony

The VE testified that in the previous 15 years, Plaintiff had worked as a mortgage broker, which was sedentary, skilled work. (A.R. 74.) The ALJ asked the VE if any jobs would be available to a hypothetical person who was at least 56 years old, had the same educational background as Plaintiff, could lift and carry 25 pounds frequently and 50 pounds occasionally, could sit for up to six hours, could stand and walk for up to six hours, could perform unlimited pushing and pulling, had no vision in the left eye, could occasionally climb stairs and balance, and needed to avoid working near moving machinery. (A.R. 75.) The VE testified that Plaintiff's prior job would not be available because that job requires constant near visual acuity. (*Id.*) The VE testified that the job of hand packager would be available to Plaintiff and that 10,000 such jobs existed in the greater Chicagoland area. (A.R. 76.) The VE testified that hospital food service worker and kitchen helper also met the criteria, and that 2,000 and 11,000 of those jobs existed, respectively. (*Id.*)

The ALJ then sought to clarify how much near visual acuity and depth perception were necessary for those jobs. (A.R. 77.) The VE testified that the hand packager and kitchen helper jobs required occasional near acuity, and the hospital food service job required frequent near acuity and occasional depth perception. (*Id.*) The VE testified that the hand packager job permit a worker to be off-task no more than 10% of the time, while the hospital food worker and kitchen helper jobs permit 20% of the time off-task. (A.R. 78.) The VE further testified that all of the jobs permit absences of one day per month. (*Id.*) Under questioning by Plaintiff's attorney, the VE testified that the jobs she named were classified as medium jobs, (A.R. 80), while the limitations described by Plaintiff—lifting only ten pounds—were consistent with sedentary, not medium, work. (A.R. 81.) The expert concluded by testifying that her opinion was consistent with the *Dictionary of Occupational Titles*. (A.R. 78.)

## III. The ALJ's Decision

On December 1, 2010, the ALJ concluded that Plaintiff was not entitled to a period of disability, disability insurance benefits, or supplemental security income. (A.R. 13.) As an initial matter, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act and could therefore be found eligible for disability insurance benefits. (*Id.*) To determine whether Plaintiff was entitled to disability insurance benefits, the ALJ conducted the five-step sequential analysis required by the Social Security Regulations. 20 C.F.R. §§ 404.1520(a), 416.920(a); (A.R. 14-15.)

First, the ALJ must determine whether the claimant is performing a substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is engaging in a substantial gainful activity, the claimant is not disabled. *Id.* Second, the ALJ must consider whether the claimant

9

has a severe medically determinable impairment, or combination of impairments, that meets a twelve-month duration requirement or is expected to result in death. 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1509. If the claimant does not have a severe impairment, the claimant is not disabled. 20 C.F.R. § 404.1520(c). Third, the ALJ must compare the claimant's impairment to the listing of impairments contained in the Social Security Regulations. If the claimant's impairment meets or equals a listed impairment and meets the duration requirement, then the claimant is considered disabled. 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant's impairment does not meet or equal a listed impairment, the ALJ must then assess the claimant's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(a)(4), 404.1520(e). Fourth, the ALJ considers her assessment of the claimant's RFC and the claimant's past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can still perform his past relevant work, he is not disabled. *Id*. Fifth, the ALJ considers her assessment of a claimant's RFC in conjunction with the claimant's age, education, and work experience to determine whether the claimant can make an adjustment to other work. 20 C.F.R. § 404.1520(a)(4)(v). If the claimant cannot make an adjustment to other work, he is disabled. *Id*. "The claimant bears the burden of proof at steps one through four, after which at step five the burden shifts to the Commissioner." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).

Here, the ALJ first found that Plaintiff had not engaged in substantial gainful activity since July 1, 2007, the alleged onset date of the disability. (A.R. 15.) Second, the ALJ found that Plaintiff had severe medically determinable impairments including obesity and "light-only vision in left eye status post retinal detachment and status post bilateral cataract surgery." (*Id*.) The ALJ also found that Plaintiff's alleged impairments of hypertension and a right heel bone

spur were not severe because they did not, individually or together, cause more than a minimal limitation in functionality. (*Id.*) The ALJ found that Plaintiff's hypertension was well-controlled by medication and that the heel spur did not require any treatment or medication. (A.R. 15-16.)

Third, the ALJ found that the combination of Plaintiff's physical impairments did not meet or equal any of the listed impairments contained within the Social Security Regulations. (A.R. 16.) The ALJ considered Sections 2.02, "Loss of Visual Acuity," and 2.03, "Contraction of the Visual Field in the Better Eye." (*Id.*) The ALJ found that Plantiff did not have loss of visual acuity under Section 2.02 because Plaintiff's corrected vision in his better eye was 20/30 and the listing requires corrected vision of 20/200 or less in the better eye. (*Id.*) Similarly, Plaintiff did not present evidence that he satisfied Section 2.03, which requires: (1) contraction of the visual field of the claimant's better eye with either the widest diameter subtending an angle around the point of fixation of no greater than 20 degrees; or (2) a mean deviation of -22 or worse, determined by automated static threshold perimetry; or (3) a visual field efficiency of 20 percent or less as determined by kinetic perimetry. (*Id.*); 20 C.F.R. § 404 App'x 1. The ALJ additionally stated that obesity is no longer a listing, but that she considered how Plaintiff's obesity aggravated his other conditions in making her determination, consistent with Social Security Ruling 02-1p. (A.R. 16.)

Because the ALJ found that Plaintiff's impairments did not meet or equal any of the listed impairments, she assessed Plaintiff's RFC and determined that he was able to perform medium work. (*Id.*) The ALJ found that Plaintiff:

> can lift and carry 25 pounds frequently and 50 pounds occasionally, sit 6 hours and stand/walk 6 hours in an 8-hour day, and has unlimited pushing and pulling. The claimant can only occasionally climb stairs and perform activities that involve

balancing. He has no vision in the left eye, and can only occasionally perform activities that require near visual acuity or depth perception. The claimant must have large type for tasks requiring reading. The claimant must avoid working near moving machinery, and must avoid concentrated exposure to hazardous machinery and unprotected heights. The claimant cannot climb ladders or operate moving machinery. He may be off task 10% of the workday, and absent 1 day per month on average.

(*Id.*) The ALJ found that the symptoms described by Plaintiff in the hearing—including lack of vision in his left eye, floaters in his right eye, fatigue from reading, loss of depth perception, loss of balance, difficulty climbing stairs, inability to drive a car, and experiencing accidents when riding a bicycle—could reasonably be caused by Plaintiff's medically determinable impairments. (A.R. 17.) The ALJ found, however, that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functioning capacity assessment." (*Id.*)

The ALJ reviewed the medical records and found that the medical evidence and testing did not support Plaintiff's allegations that his limitations prevented him from performing all work-related activity. (A.R. 18.) First, the ALJ found that Plaintiff's daily activities were not limited to the extent one would expect given Plaintiff's subjective complaints. (*Id.*) The ALJ noted that Plaintiff reported that he lived alone, prepared his own food, performed household chores, had no problems with personal care, went outside daily, and used public transportation. (*Id.*) The ALJ also noted that Plaintiff testified that he was able to ride a bicycle. (*Id.*)

Next, the ALJ found that the medical evidence did not support Plaintiff's contention that he was unable to read clearly for more than a few minutes. (*Id.*) The ALJ noted that throughout the record, Plaintiff's right eye's visual acuity was measured at 20/20, 20/30, or 20/40. (*Id.*) The ALJ observed that Plaintiff's treating physician, Dr. Pahuja, wrote in December 2008 that

Plaintiff had full capacity for all functions, and that the consultative ophthalmologist, Dr. Rao, opined that Plaintiff's visual tasking and ambulation were relatively normal with the right eye. (A.R. 18-19.)

The ALJ stated that Plaintiff's RFC of medium exertion took into account Plaintiff's obesity and small right heel spur and included workplace protections for a monocular person. (A.R. 19.) The ALJ also explained that the RFC limited tasks involving near vision, even though neither Plaintiff's treating doctor nor the consultative ophthalmologist proposed limitations to right eye vision. (*Id.*) The ALJ found that Plaintiff's concerns about tardiness and getting around in unfamiliar locations were unfounded because Plaintiff could use public transportation and was capable of learning a new route. (*Id.*) The ALJ also found that no medical evidence suggested that Plaintiff was limited to lifting 10 pounds. (*Id.*)

The ALJ stated that in determining the RFC, she gave controlling weight to the opinion of Plaintiff's treating physician, Dr. Pahuja. (*Id.*) The ALJ stated that Dr. Pahuja opined in December 2007 that Plaintiff was capable of medium exertion and of lifting and carrying 25 pounds frequently and 20 pounds occasionally.[2] (*Id.*) The ALJ also gave controlling weight to Dr. Ahuja's assessment that Plaintiff's right eye visual acuity was 20/30 and that Plaintiff "might have difficulty with depth perception and needs to avoid workplace hazards." (*Id.*) The ALJ found the assessment of the physicians employed by DDS, Drs. Rao and Fischer, to be largely consistent with the medical evidence because they opined that due to decreased left-side vision, Plaintiff should avoid working near machinery and avoid concentrated exposure to heights. (*Id.*)

---

[2] This statement seems to be a typo because Dr. Pahuja's report indicates that Plaintiff can lift "no more than 50 pounds at a time with frequent lifting of up to 25 pounds." (A.R. 254.) Both Plaintiff and the Court assume that the ALJ meant that Plaintiff can lift and carry 50 pounds occasionally.

However, the ALJ stated that she gave the portion of Dr. Fischer's evaluation assessing Plaintiff's exertional limitations little weight because it conflicted with the opinion of Plaintiff's treating physician. (*Id.*)

Fourth, the ALJ found that Plaintiff did not have the RFC to perform his past relevant work as a mortgage broker. (A.R. 20.) The ALJ relied on the testimony of the VE, who testified that a mortgage broker constantly performs tasks involving near visual acuity and that Plaintiff could not meet the functional demands of the job. (*Id.*)

Fifth, the ALJ assessed the Plaintiff's age, education, work experience, and RFC. (*Id.*) She concluded that jobs existed in the national economy that Plaintiff could perform. (*Id.*) The ALJ relied upon the VE's testimony that an individual with Plaintiff's age, education, work experience, and RFC would be able to perform the requirements of several jobs that existed in significant numbers in the Chicago region, including hand packager and kitchen helper. (A.R. 21.) Consequently, the ALJ found that Plaintiff was not disabled within the meaning of the Act. (*Id.*)

Plaintiff requested review of the ALJ's decision on January 4, 2011. (A.R. 8.) On August 4, 2011, the Appeals Council denied Plaintiff's request for review, (A.R. 1-3), making the ALJ's ruling the final decision of the Commissioner subject to judicial review. *Villano v. Astrue*, 556 F.3d 558, 561-62 (7th Cir. 2009). On October 6, 2011, Plaintiff filed this action seeking judicial review. (R. 1, Compl.) In his complaint, Plaintiff requests that the decision of the ALJ be set aside or, in the alternative, that the matter be reversed and remanded for further proceedings. (*Id.* ¶ 8.)

14

On April 16, 2012, Plaintiff filed a motion for summary judgment. (R. 14, Pl.'s Mot.)

Plaintiff argues that the ALJ failed to properly consider Plaintiff's visual impairment, to properly

support the RFC finding and consider significant evidence favorable to Plaintiff's claim, and to

properly analyze Plaintiff's credibility. (*Id.* at 2.) The Commissioner filed a response on July 16,

2012, (R. 22), and Plaintiff filed a reply on August 6, 2012, (R. 23).

## LEGAL STANDARD

In reviewing the ALJ's decision, this Court determines whether the ALJ's factual

determinations are supported by substantial evidence and based on proper legal criteria. *Scheck*

*v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). "Substantial evidence is such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Kepple v.*

*Massanari*, 268 F.3d 513, 516 (7th Cir. 2001)) (internal quotation marks omitted). "Under this

standard, the ALJ's decision, if supported by substantial evidence, will be upheld even if an

alternative position is also supported by substantial evidence." *Id.* (citing *Arkansas v. Oklahoma*,

503 U.S. 91, 113 (1992)). While an "ALJ is not required to mention every piece of evidence,"

she must establish an "accurate and logical bridge" between the evidence and her conclusions.

*Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008) (quoting *Young v. Barnhart*, 362 F.3d 995,

1002 (7th Cir. 2004)); *see also Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008). In reviewing

the ALJ's conclusions, the Court "will 'conduct a critical review of the evidence,' considering

both the evidence that supports, as well as the evidence that detracts from, the Commissioner's

decision." *Briscoe*, 425 F.3d at 351 (quoting *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539

(7th Cir. 2003)). It is not the role of this Court, however, to "reweigh evidence, resolve conflicts,

decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

## ANALYSIS

A claimant is qualified to receive disability benefits if he is found to be disabled within the meaning of the Act. 42 U.S.C. § 423(a)(1)(E); *Briscoe*, 425 F.3d at 351. A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also Barnhart v. Walton*, 535 U.S. 212, 217-22 (2002) (discussing the definition at length). Under the Act, a claimant is considered to have a disability only if his physical or mental impairments are of such severity that he is unable to do his previous work and cannot, when "considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A). Additionally, to receive disability insurance benefits, a claimant must prove that he was disabled on or before the date his insured status expired. *Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997).

The Social Security Regulations provide a sequential five-step test for determining whether a claimant qualifies for disability benefits. 20 C.F.R. §§ 404.1520(a), 416.920(a). Here, as discussed above, the ALJ engaged in the five-step sequential analysis and ultimately concluded that Plaintiff was not disabled. (A.R. 20-21.) At steps one and two, the ALJ found that Plaintiff had not engaged in substantial gainful activity and that he had a severe medically

16

determinable impairment. (A.R. 15.) At step three, the ALJ found that Plaintiff's impairments did not meet or equal a listed impairment. (*Id.* at 16.) Therefore, the ALJ assessed Plaintiff's RFC and found that Plaintiff could perform medium work subject to a number of limitations stemming from his visual impairment. (*Id.*) At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. (*Id.* at 20.) At the fifth step, the ALJ found that Plaintiff was not disabled because he could perform jobs that exist in significant numbers in the national economy. (*Id.*)

Plaintiff alleges that the ALJ made several errors in her determinations. Plaintiff argues that the ALJ failed to properly analyze Plaintiff's credibility; to properly consider Plaintiff's visual impairments; and to properly support the RFC determination and consider significant evidence favorable to Plaintiff's claim.

## I.    The ALJ's credibility determination

Plaintiff alleges that the ALJ improperly evaluated his credibility. (R. 15, Pl.'s Mem. at 8-15.) Plaintiff argues that the ALJ should have credited his statements about his total lack of depth perception, limitations in standing and walking, and inability to lift more than a gallon of milk or a maximum of 20 pounds once. (A.R. 8-10.) Plaintiff also argues that the ALJ improperly analyzed his activities of daily living by failing to consider the limitations on performing those activities that Plaintiff described. (A.R. 13-14.)

Because the ALJ is "in the best position to determine a witness's truthfulness and forthrightness . . . this court will not overturn an ALJ's credibility determination unless it is 'patently wrong.'" *Shideler v. Astrue*, 688 F.3d 306, 310-11 (7th Cir. 2012) (citing *Skarbek v. Barnhart*, 390 F.3d 500, 504-05 (7th Cir. 2004) (per curiam)). The ALJ must consider the entire

case record when determining a claimant's credibility, including objective medical evidence of the claimant's impairments, the claimant's daily activities and limitations, allegations of pain and other aggravating factors, and treatment. *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) (citing *Scheck*, 357 F.3d at 703); *see also* S.S.R. 96-7p, 1996 WL 374186, at *2 (July 2, 1996). On review, the Court "merely examine[s] whether the ALJ's determination was reasoned and supported." *Prochaska*, 454 F.3d at 738 (citing *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008)).

Although there is a high level of deference afforded to an ALJ's credibility determination, *Shideler*, 688 F.3d at 310-11, the ALJ in this case failed to provide any support or rationale for her credibility determination. After briefly describing Plaintiff's testimony, the ALJ recited:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(A.R. 17.) She then went on to discuss the evidence of Plaintiff's visual impairment without any explanation of why she found his testimony regarding "the intensity, persistence and limiting effects of [his] symptoms" incredible or linking this finding in any way to the evidence in the record. This is nearly verbatim the boilerplate language that is consistently criticized by the Seventh Circuit as failing to provide any meaningful and reviewable information about what evidence the ALJ considered in making her credibility determination. *Bjornson v. Astrue*, 671 F.3d 640, 644-46 (7th Cir. 2012) (examining in-depth the problems with using this sort of template to ignore claimants' credibility and ending with an admonishment that the SSA "had better take a close look at the utility and intelligibility of its 'templates'"); *see also Shauger v.*

*Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) ("Credibility findings must have support in the record, and hackneyed language seen universally in ALJ decisions adds nothing."); *Punzio v. Astrue*, 630 F.3d 704, 709 (7th Cir. 2011) ("[T]o read the ALJ's boilerplate credibility assessment is enough to know that it is inadequate and not supported by substantial evidence. That is reason enough for us to reverse the judgment."). Additionally, the phrase "to the extent they are inconsistent with the above [RFC]" indicates that the ALJ first determined what Plaintiff's RFC would be and then used that determination to assess Plaintiff's credibility, a reversal of the proper order of an RFC assessment. *Bjornson*, 671 F.3d at 645. This is problematic because the assessment of a claimant's ability to work frequently "depend[s] heavily on the credibility of her statements concerning the 'intensity, persistence and limiting effects' of her symptoms." *Id.*

Plaintiff argues that the ALJ did not consider the limitations on Plaintiff's activities of daily living. The ALJ explained that the Plaintiff "described daily activities which are not limited to the extent one would expect, given his subjective complaints." (A.R. 18.) The ALJ noted that Plaintiff "reported that he . . . shops for food, does all household chores . . . uses public transportation," and that "he remains able to ride a bicycle." (*Id.*) Plaintiff contends that his testimony demonstrated that he performed these daily activities "slowly and with difficulty." (R. 15, Pl.'s Mem. at 14.) The Seventh Circuit has warned that an ALJ cannot consider a claimant's household activities but ignore the limitations the claimant faces in performing them. *Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009); *see also Craft*, 539 F.3d at 680.

Here, as in *Moss*, Plaintiff testified to having a number of limitations in performing the everyday activities the ALJ considered, most of which were ignored by the ALJ. The Commissioner first argues that "the ALJ reasonably considered that, although he no longer

19

drove, Plaintiff had a valid driver's license with no restrictions other than that he needed to wear glasses." (R. 22, Def.'s Resp. at 4.) This is a mischaracterization of Plaintiff's testimony. Although the Plaintiff did testify to having a driver's license that had not yet expired and only restricted him to wearing glasses while driving, (A.R. 53), he also testified: "Driving is gone. I couldn't pass an eye test if I had to take that driver's test again." (A.R. 54; *see also* A.R. 70 ("I tried to imagine myself driving a car at night and that was probably the scariest thing I could think of doing with the vision I have.")).

The Commissioner next argues that "[t]he ALJ reasonably contrasted Plaintiff's allegations that he had no depth perception and had lost his sense of balance with the fact that he rode a bike regularly and was able to use public transportation." (R. 22, Def.'s Resp. at 9.) Plaintiff simply did not testify that he rode a bike regularly. Plaintiff's counsel informed the ALJ that "not too recently, but the last time [Plaintiff] tried riding his bike," he had an accident because he mistook a four-inch curb for a crack in the sidewalk. (A.R. 47.) Plaintiff's testimony also indicated that he was "probably not going to ride a bike again." (A.R. 56.) The ALJ also failed to consider Plaintiff's limitations on walking, such as his inability to distinguish steep curbs from ramps or to discern cracks in the sidewalk. (A.R. 68.) According to the Commissioner, "[t]he ALJ also considered Plaintiff's allegation that he had difficulty walking with his statements that he walked to the grocery store and carried his groceries home," (R. 22, Def.'s Resp. at 9). However, the ALJ clearly ignored Plaintiff's testimony that he "live[s] two blocks from the nearest grocery store, so it's a familiar walk," but that "unfamiliar territory is tough walking." (A.R. 57-58.)

The Commissioner relies on the ALJ's erroneous characterization of Plaintiff's abilities to justify the ALJ's dismissal of Plaintiff's complaints about his lack of depth perception: "the fact that Plaintiff was able to engage in these activities at all, particularly riding a bicycle, supports the ALJ's finding that he [sic] at least some capacity to perceive depth." (R. 22, Def.'s Resp. at 5.) The Court finds, however, that the facts that Plaintiff's driver's license has not yet expired, that he no longer rides his bicycle because he crashed into a curb the last time he did, and that he can take a familiar two-block walk but is so uncomfortable in unfamiliar locations that he took a taxi between the train station and the hearing rather than walk do not provide support for the ALJ's determination that Plaintiff's complaint of lack of depth perception was incredible.

Because the ALJ failed to provide adequate and reviewable information about what evidence she relied upon, *Bjornson v. Astrue*, 671 F.3d at 645, and because she considered Plaintiff's household activities but ignored his limitations, *Moss*, 555 F.3d at 562, the Court finds that the ALJ erred in making her credibility determination. The ALJ's error in this regard is grounds for reversing and remanding the decision of the ALJ. *Punzio*, 630 F.3d at 709. On remand, the ALJ should clearly explain the reasons and evidence that form the basis of any credibility determination and, unless she properly finds Plaintiff's testimony to be incredible, consider the limitations to Plaintiff's daily activities in the RFC assessment.

## II.     The ALJ's consideration of Plaintiff's visual impairments

Plaintiff also objects to the ALJ's consideration of Plaintiff's visual impairments. Plaintiff argues that the ALJ should not have found that Plaintiff could "occasionally" perform work requiring depth perception because his retinal detachment left him without any capacity for

21

depth perception. (R. 15, Pl.'s Mem. at 6.) According to Plaintiff, either depth perception exists or it does not; one cannot have occasional depth perception. (*Id.*) Plaintiff also argues that the ALJ did not follow the requirements of Social Security Ruling 96-8p because she failed to explain how Plaintiff's visual impairments would affect his work and because she did not provide an adequate explanation of how she considered the evidence in making the RFC determination. (*Id.* at 6-7.)

The Court determines whether the ALJ's factual determinations are supported by substantial evidence and based on proper legal criteria. *Scheck*, 357 F.3d at 699. The RFC must address both exertional and nonexertional functions and must state an individual's capacity in terms of work-related functions. S.S.R. 96-8, 1996 WL 374184, at *5-*6. Additionally, "[t]he RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. "In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do." *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995) (citing 20 C.F.R. § 404.1545(a); 20 C.F.R. § 416.945(a)).

The ALJ asserted that she considered Plaintiff's treating ophthalmologist's opinion that "because of the difference between the claimant's eyes, he would have problems with depth perception." (A.R. 17.) The ALJ also noted that Plaintiff described his depth perception as "poor" to the internal medicine consultative examiner. (A.R. 18.) Finally, the ALJ stated that "[a]lthough claimant testified in great detail about the change in his depth perception since the

surgery in 2007 that was unsuccessful in repairing his left retina, the objective medical evidence does not corroborate or support his contention that he is unable to read clearly for more than a few minutes with the right eye." (*Id.*) Following this recitation of the evidence, the decision went on to explain why Plaintiff had occasional near visual acuity. (*Id.*) To build a logical bridge, the ALJ must "sufficiently articulate his assessment of the evidence to assure us that he considered the important evidence and to enable us to trace the path of his reasoning." *Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999) (internal quotation marks and citations omitted). Here, the ALJ did not articulate how the ophthamologist's opinion and Plaintiff's testimony about Plaintiff's depth perception were factored into her assessment. The ALJ thus failed to build a logical bridge between this evidence and her conclusion that Plaintiff could "occasionally perform activities that require . . . depth perception," (A.R. 16). *See Craft*, 539 F.3d at 673.

Where the ALJ has erred by failing to build a "logical bridge," the Court looks at the evidence in the record to determine whether it can predict with great confidence what the result on remand will be. *See McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011). The Court will not remand a case to the ALJ for further specification where the Court is convinced that the ALJ will reach the same result. *Id.* (citing *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010)). Given the ALJ's erroneous credibility determination, it is not obvious that on remand the ALJ will conclude that Plaintiff is capable of performing work that requires occasional depth perception. Much of Plaintiff's testimony supports his allegation that he cannot perform activities that require even occasional depth perception. Thus, the ALJ's failure to build a "logical bridge" was not harmless error, and the ALJ's conclusion that Plaintiff could perform jobs requiring occasional depth perception is remanded. On remand, the ALJ should consider the entire record,

including Plaintiff's testimony, in the RFC assessment. If the ALJ does find that Plaintiff can

occasionally perform activities requiring depth perception, she needs to explain how she arrived

at that conclusion. *See Hickman*, 187 F.3d at 689.

## III.    The ALJ's RFC analysis

Plaintiff next argues that no evidence supports the ALJ's finding that Plaintiff was

capable of standing and walking six hours out of an eight-hour work day and lifting 25 pounds

frequently and 50 pounds occasionally.[3]  (R. 15, Pl.'s Mem. at 9-10.)  Plaintiff contends that the

ALJ's finding was flawed because the ALJ failed to properly consider Plaintiff's bone spur and

obesity, mischaracterized a treating doctor's opinion, and failed to explain her determinations

about Plaintiff's abilities to stay on task and attend work. (*Id.* at 10.)  The Court addresses each

argument in turn.

### A.    Plaintiff's obesity and bone spur

Plaintiff alleges that the ALJ failed to consider Plaintiff's bone spur and the combination

of the bone spur and obesity when making her determination about Plaintiff's ability to stand,

walk, and lift. (*Id.*)  The Court must determine whether the ALJ's factual findings are supported

by substantial evidence and based on proper legal criteria. *Scheck*, 357 F.3d at 699.  If the ALJ

finds that one or more of the claimant's impairments is "severe," then she must "consider the

*aggregate* effect of the entire constellation of ailments—including those impairments that in

isolation are not severe." *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003) (per

curiam) (citing 20 C.F.R. § 404.1523).  Here, the ALJ found at step 2 that Plaintiff had at least

one severe impairment. (A.R. 15.)  Therefore, the ALJ was required to consider all of Plaintiff's

---

[3] As discussed in footnote 2, the Court assumes that the ALJ intended to state that
Plaintiff could lift and carry 50 pounds occasionally.

impairments, including his obesity and heel spur. Although obesity is no longer considered an impairment on its own, an ALJ is required to consider the effects of obesity together with the underlying impairments. S.S.R. 02-1p, 2000 WL 628049, at *6 (Sept. 12, 2002); *Castile v. Astrue*, 617 F.3d 923, 928 (7th Cir. 2010). The Social Security Regulations instruct that obesity may compound, and should be considered with regards to, impairments of the respiratory, cardiovascular, and musculoskeletal systems. 20 C.F.R. § 404 App'x 1. Obesity is not indicated as a compounding factor of "Special Senses and Speech," the category into which Plaintiff's visual impairment fits. *Id.*

The ALJ stated that her determination "takes into account [Plaintiff's] obesity and small right heel spur," (A.R. 19), but she did not explain how she actually considered the obesity and heel spur. The ALJ simply stated that she "considered how the claimant's obesity aggravated his other conditions in making this determination, consistent with SSR-02-01p." (A.R. 16.) Nevertheless, an ALJ may consider obesity indirectly when she adopts limitations suggested by reviewing doctors who are aware of the obesity. *Prochaska*, 454 F.3d at 736-37; *Skarbek*, 390 F.3d at 504. Here, the ALJ stated that she gave controlling weight to the opinion of Plaintiff's treating physician, Dr. Pahuja, in assessing Plaintiff's RFC. (A.R. 19.) The ALJ noted that Dr. Pahuja opined that Plaintiff had "full capacity" for all functions and could lift 25 pounds frequently and a maximum of 50 pounds. (*Id.*) During this same evaluation, Dr. Pahuja noted that Plaintiff was obese. (A.R. 17.) Thus, by adopting Dr. Pahuja's opinion, the ALJ indirectly considered Plaintiff's obesity.

Plaintiff next argues that Dr. Pahuja did not consider Plaintiff's obesity in combination with his bone spur because Dr. Pahuja's evaluations took place before Plaintiff's bone spur was

25

diagnosed in 2009. (R. 15, Pl.'s Mem. at 10.) However, the medical records from Stroger

Hospital, where the bone spur was diagnosed, record Plaintiff's weight at 240 pounds, (A.R.

332), and as the ALJ explicitly noted, Stroger Hospital did not recommend treatment or prescribe

any medication for the bone spur, (A.R. 16). It is clear that the ALJ considered the hospital

records, and thus, indirectly considered the combination of Plaintiff's obesity and bone spur. *See*

*Prochaska*, 454 F.3d at 736-37; *Skarbek*, 390 F.3d at 504.

Furthermore, no evidence in the record supports Plaintiff's contention that "[w]ith the

bone spur, walking or standing for any period of time would be painful," and that his obesity

would further aggravate this pain. (R. 15, Pl.'s Mem. at 10.) Plaintiff did not mention foot pain

or the bone spur when the ALJ asked him whether any physical problems, besides his visual

impairments, limited his ability to stand, walk, or sit. (A.R. 66.) The records from Plaintiff's

visit to Stroger Hospital in February of 2009 are the only medical evidence included in the record

addressing Plaintiff's bone spur. (*See* A.R. 331-35.) While medical evidence does diagnose

Plaintiff as being obese, no evidence in the record indicates that he is in any way impaired by his

obesity. Given the limited evidence about the bone spur presented to her, the ALJ reasonably

relied on the records from Stroger Hospital to support her conclusions about Plaintiff's obesity

and bone spur. *See Scheck,* 357 F.3d at 702 ("It is axiomatic that the claimant bears the burden

of supplying adequate records and evidence to prove their claim of disability.") (citing 20 C.F.R.

§ 404.1512(c); *Brown v. Yuckert*, 482 U.C. 137, 146 n.5 (1987)); *Prochaska*, 454 F.3d at 737

(finding that "any error on the ALJ's part was harmless" where the ALJ implicitly considered the

plaintiff's obesity through his review of medical reports that explicitly stated that the plaintiff

was obese, and the plaintiff failed to provide any medical evidence or testimony indicating that

her obesity contributed to her physical limitations). Accordingly, contrary to Plaintiff's contention, the Court finds that the ALJ properly considered Plaintiff's bone spur in combination with his obesity.

## B. Dr. Pahuja's opinion

Plaintiff makes two arguments alleging error with regard to the ALJ's citation of Dr. Pahuja's opinion about Plaintiff's ability to lift. First, Plaintiff argues that the ALJ committed reversible error because she misstated the record with regard to Dr. Pahuja's opinion. (R. 15, Pl.'s Mem. at 10-11.) According to Plaintiff, Dr. Pahuja stated that "Plaintiff was capable of [lifting] a maximum of 50 pounds at one time with *no more than* frequent lifting of 25 pounds," while the ALJ reported that Dr. Pahuja opined that Plaintiff could "lift and carry 25 pounds frequently." (*Id.*) (emphasis added). In fact, Dr. Pahuja indicated that Plaintiff could lift "[n]o more than 50 pounds at a time with frequent lifting of up to 25 pounds." (A.R. 254.) The Court finds no misstatement and, therefore, no reversible error in the ALJ's recitation of Dr. Pahuja's opinion.

Plaintiff also argues that the ALJ erred because she failed to explain why she concluded that Plaintiff could lift 50 pounds "occasionally" when Dr. Pahuja's opinion did not address how frequently Plaintiff could lift 50 pounds. (R. 15, Pl.'s Mem. at 10.) Plaintiff suggests that the ALJ did not provide a sufficient narrative describing how the evidence supported her conclusion, in violation of Social Security Ruling 96-8p, and that she needed to explain how she concluded that Dr. Pahuja meant that Plaintiff could lift occasionally. (*Id.*) The Court finds, however, that the ALJ supported her determination by citing Dr. Pahuja's opinion that Plaintiff could lift "[n]o more than 50 pounds at a time with frequent lifting of up to 25 pounds." (*Id.*) "Occasionally"

27

means "from very little up to one-third of the time," and "frequently" means "from one-third to two-thirds of the time." S.S.R. 83-10, 1983 WL 31251, at *5. Dr. Pahuja's opinion that Plaintiff was capable of lifting up to 50 pounds but could not lift that much frequently fits cleanly within the definition of "occasionally." Thus, the ALJ accurately recited Dr. Pahuja's opinion, evidence which reasonably supports her conclusion that Plaintiff could occasionally lift 50 pounds. As the ALJ summarized at the end of the hearing, this finding is consistent with the opinions of three separate doctors and is not grounds for reversal. (A.R. 84-85.)[4]

### C.     Findings about time off-task and absences from work

Finally, Plaintiff argues that the ALJ's findings that Plaintiff could be off-task for 10% of the workday and absent one day a month have no basis in the record. (R. 15, Pl.'s Mem. at 11.) Plaintiff appears to be correct. Other than stating that "[c]oncerns about tardiness due to traveling to an unfamiliar location are not well-founded; claimant is able to use public transportation and nothing in the record permits the inference that he could not learn a new route," (A.R. 19), the ALJ did not address Plaintiff's ability to stay on-task at work or to attend work. The ALJ did not establish a "logical bridge" between the evidence and her conclusion. *See Craft*, 539 F.3d at 673. However, the Court does not remand a case to the ALJ for further specification where the Court is convinced that the ALJ will reach the same result. *McKinzey*, 641 F.3d at 892. Thus, when the ALJ has erred by failing to build a "logical bridge," the Court looks at the evidence in the record to see if it can predict with great confidence what the result on remand will be. *See id.*

---

[4] The ALJ made this statement in response to Plaintiff's request to file a brief regarding the medium RFC determination. The ALJ welcomed him to do so but, as far as the Court can tell, no such brief was ever filed.

Here, a review of the record convinces the Court that no reasonable ALJ would conclude that Plaintiff was entitled to greater time off-task or more absences from work. Significantly, Plaintiff does not allege that he was entitled to greater restrictions and does not point to any evidence in the record suggesting that he could not stay on-task or attend work. *See Scheck*, 357 F.3d at 700-01 (finding that when an ALJ did not reject any evidence in the record because no evidence supported claimant's position, she did not err by failing to specifically articulate the reasons for reaching her conclusion); *see also Duvergel v. Apfel*, No. 99 Civ. 4614(AJP), 2000 WL 328593, at *11 (S.D.N.Y Mar. 29, 2000) ("An ALJ may rely not only on what the medical records say, but also on what they do not say.").

Plaintiff cites three recent cases to support his argument that the ALJ's failure to explain what evidence supported her findings is a reversible error, but all of the cases are easily distinguishable from the instant case. In *Scott v. Astrue*, the Seventh Circuit found that "the ALJ failed to build the requisite 'logical bridge' between the evidence and her conclusion" because the ALJ cited a medical examination that did not actually support the RFC limitations while medical evidence and the claimant's testimony indicated that the limitations were inappropriate. 647 F.3d 734, 740-41 (7th Cir. 2011). In *Accurso v. Astrue*, the ALJ failed to address relevant evidence in the case record that contradicted his RFC determination. No. 10 C 0968, 2011 WL 578849, at *6 (N.D. Ill. Feb. 9, 2011). Similarly, in *Chase v. Astrue*, the Seventh Circuit remanded because the ALJ had assessed an RFC with an allowance for the claimant to elevate his foot 15 to 20 degrees after the claimant had testified that his impairment required 90 degrees of elevation. 458 Fed. App'x 553, 556-57 (7th Cir. 2012).

Here, however, Plaintiff never testified that he was entitled to any time off-task or that he needed to be absent. The only evidence in the record that has any bearing on Plaintiff's ability to be present and on-task at work are Dr. Pahuja's assessment that Plaintiff had full capacity to work an eight-hour day five days per week, (A.R. 254), and Plaintiff's statement in his May 3, 2008 Function Report that he needed fifteen minutes of rest with his eyes closed in the afternoons, (A.R. 209). Fifteen minutes of time off-task each day fits solidly within a determination that 10% of time off-task is appropriate. Finally, even if Plaintiff did need additional time off-task, the kitchen helper job, which requires no depth perception, allows for 20% of time off-task, as does the hospital worker job. (A.R. 78.) Accordingly, the ALJ's determination that Plaintiff could be off-task for 10% of the work day and absent one day a month is, at most, harmless error. *See McKinzey*, 641 F.3d at 892.

The Court finds that the ALJ's determinations that Plaintiff was capable of standing and walking six hours out of an eight-hour work day and lifting 25 pounds frequently and 50 pounds occasionally were supported by substantial evidence and based on proper legal criteria. *Scheck*, 357 F.3d at 699. The Court remands the ALJ's credibility determination for consideration of the entire record, *Prochaska*, 454 F.3d at 738, including Plaintiff's limitations in performing everyday activities, *Moss*, 555 F.3d at 562. If the ALJ finds Plaintiff incredible, she should clearly articulate the reasons for that finding. *Bjornson*, 671 F.3d at 645. The Court also remands the ALJ's finding that Plaintiff is capable of performing activities that require occasional depth perception. On remand, the ALJ should also consider Plaintiff's testimony regarding his depth perception in assessing his RFC. *See Hickman*, 187 F.3d at 689.

## CONCLUSION

30

For the reasons set forth above, the Court GRANTS Plaintiff's motion for summary judgment (R. 14). The Court reverses the ALJ's decision and remands this case for proceedings consistent with this opinion. The Court directs the Clerk to enter judgment in favor of Plaintiff.

ENTERED:

**Judge Ruben Castillo**
**United States District Court**

**Dated: November 15, 2012**